627 A.2d 763

Gail HOLMES and Terri Hyden, Co–Administrators of the Estate of Phillip W. Johnson, Deceased, Appellants,

v.

LANKENAU HOSPITAL; Lankenau Hospital, Dept. of Radiology; Dr. Judith Johnson; Dr. Howard A. Richter; Dr. Nelson M. Oyesiku; Dr. Robert Fine; Dr. Charles Schnall; Dr. Ronald W. Russell; Dr. Shiun–Tin–Kerr; Dr. Robert K. Jones; Dr. Irwin K. Kline; Dr. Hugo Rodriguez; Dr. Michael E. Fischer; Dr. Daniel Erhard; Dr. Benack; Dr. Piazza; and Dr. Gallagher, Appellees.

Superior Court of Pennsylvania.

Argued Feb. 18, 1993.

Filed July 2, 1993.

454

Larry Glass, Philadelphia, for appellants.

Robin B. Arnold, Philadelphia, for appellee Lankenau.

Robert B. Mulhern, Jr., Philadelphia, for appellees Fine and Schnall.

Patrick J. McMenamin, Jr., Norristown, for appellees Richter and Oyesiku.

Before BECK, POPOVICH, JJ., and BROSKY, JJ.

POPOVICH, Judge.

This is an appeal from an order granting appellees' motions for summary judgment. We find that the trial court did not err in granting summary judgment. Accordingly, we affirm.

The facts of the present case are as follows: Appellants, Gail Holmes and Terri Hyden, filed a medical malpractice suit against appellees, Lankenau Hospital, Dr. Johnson, Dr. Russell, Dr. Kerr, Dr. Richter and Dr. Fine. Appellants alleged that appellees negligently treated their father, Phillip Johnson, at Lankenau Hospital.

On February 4, 1984, Phillip Johnson fell in the home of Reuben and Girdell Robinson. Thereafter, he was taken to Lankenau Hospital for emergency treatment of injuries he sustained in the fall. Mr. Johnson was then admitted to Lankenau Hospital for further treatment. Phillip Johnson died at Lankenau Hospital on February 9, 1984.

On March 19, 1985, Gail Holmes, in her capacity as co-administratrix of Johnson's estate, executed a signed release, witnessed by Terri Hyden, in favor of Reuben and Girdell Robinson, in exchange for the sum of $10,000.00. The release provides, in relevant part:

I do hereby release and forever discharge Reuben Robinson and Girdell Robinson *and any other person, firm or corporation charged or chargeable with responsibility or liability*, their heirs, representatives and assigns, from any and all claims, demands, damages, costs, expenses, loss of services, actions and causes of action arising from any act or occurrence up to the present time ... in consequence of an accident that occurred on or about the 4th day of February, 1984, at or near [the Robinson's home] (emphasis added).

After the existence of the release was disclosed to appellees through discovery, appellees filed motions for summary judgment that were granted by the trial court.

On appeal, appellants raise the following issues:

1. [Appellees] failed to plead "release" as an affirmative defense, so that summary judgments based on the release were improperly entered.

2. Summary judgment based on the release, was inappropriate where the signing [appellant] could not, and did not, reasonably understand the release to cover possible medical malpractice.

3. The release, as worded, does not bind the estate so as to prevent claims for future medical malpractice, where only one of the co-administrators executed the release.

 An order granting summary judgment will not be reversed unless the trial court has committed an error of law or clearly abused its discretion. *Cooperstein v. Liberty Mutual Fire Insurance Company,* 416 Pa.Super. 488, 611 A.2d 721 (1992). Summary judgment is to be granted only in those cases that are clear and free from doubt, where the undisputed allegations of the pleadings and the other permissible material filed in support of and in opposition to the motion reveal that there is no genuine issue as to a material fact and that the movant is entitled to judgment as a matter of law. *Krause v. Great Lakes Holdings, Inc.,* 387 Pa.Super. 56, 563 A.2d 1182 (1989), appeal denied, 524 Pa. 629, 574 A.2d 70 (1990); Pa.R.C.P. No. 1035, 42 Pa.C.S.A.

Appellants argue that the trial court improperly granted summary judgment. Appellants claim that appellees failed to plead release as an affirmative defense as new matter, and therefore, waived the right to assert the defense in a motion for summary judgment. We disagree.

 According to Pa.R.C.P. No. 1030, 42 Pa.C.S.A., release is an affirmative defense that must be pleaded in a responsive pleading under the heading "New Matter." If the affirmative defense of release is not pleaded according to Rule 1030, the right to assert the defense has been waived. *Ruhe v. Kroger Company,* 425 Pa. 213, 228 A.2d 750 (1967).

 In the instant case, appellees had no knowledge of the release when they filed their answers and new matter. The existence of the release was revealed through discovery sometime after pleadings had been filed. According to the rules of procedure, appellees should have requested leave to amend the new matter portion of their answers to include the affirmative defense of release. Pa.R.C.P. No. 1033, 42 Pa.C.S.A. Motions for summary judgment could then have been filed following the filing of appellees' amended pleadings. Instead,

appellees simply filed a motion for summary judgment based on the release.

Although we find that appellees did not technically follow the rules of civil procedure, appellees' procedural error does not warrant reversal of the trial court's order granting summary judgment. The rules of civil procedure must be liberally construed so that actions such as the present one are resolved in a just, speedy, and inexpensive manner consistent with Pa.R.C.P. No. 126.[1]

Appellants have failed to show that they were prejudiced by appellees' failure to comply strictly with procedural rules. Appellants had the opportunity to respond to appellees' motion for summary judgment. Therefore, although appellees did not amend their pleadings so as to include the defense of release, appellants were not denied the opportunity to respond to appellees' arguments regarding the defense.

A panel of this court was recently presented with a similar issue in *DiLauro v. One Bala Avenue Associates*, 419 Pa.Super. 191, 615 A.2d 90 (1992). The plaintiff in *DiLauro*, argued that the trial court erred by instructing the jury on the defense of assumption of risk because the defendants failed to assert the defense of assumption of risk in responsive pleadings. Although this court acknowledged that all affirmative defenses must be pleaded in a responsive pleading under the heading "New Matter," this court ruled that the trial court correctly admitted the defense. This court stated the following in *DiLauro:*

A trial court may on its own motion, permit or require amendment of a pleading, except where surprise or prejudice to the other party would result. *Spain v. Vicente*, 315 Pa.Super. 135, 144, 461 A.2d 833 (1983); *Sullivan v. Allegheny Ford Truck Sales*, 283 Pa.Super. 351, 357, 423 A.2d

---

1. Pa.R.C.P. No. 126, 42 Pa.C.S.A. provides:

 The rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable. *The court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties.*

1292, 1295 (1980). Contrary to his present assertions, appellant was well aware before trial that the defense of assumption of the risk would be a central issue in this case. Appellees' trial brief is replete with references to "assumption of the risk." ... Finding no surprise or prejudice to appellant, it was entirely proper for the lower court to instruct the jury on assumption of risk. *By so doing, the court, in effect, permitted amendment of appellees' answer on its own motion.*

615 A.2d at 93 (emphasis added).

■ Presently, appellants were obviously aware of the release. The appellees' assertion of the defense of release in motions for summary judgment did not cause either surprise or prejudice to appellants. In their response to appellees' motions for summary judgment, appellants argued that since appellees had not pleaded the affirmative defense of release, the defense had been waived. By granting the appellees' motions for summary judgment, the trial court, in effect, permitted amendment of appellees' answer on its own motion. *DiLauro.*

■ Additionally, a decision to reverse the trial court's grant of summary judgment because of this procedural defect would conflict with our supreme court's decision not to place form over substance. Specifically, our supreme court stated the following:

It has been our policy to overlook ... procedural errors when a party has substantially complied with the requirements of the rule and no prejudice would result. "Procedural rules are not ends in themselves, but means whereby justice, as expressed in legal principles, is administered. They are not to be exalted to the status of substantive objectives. *McKay v. Beatty,* 348 Pa. 286–87, 35 A.2d 264, 265 (1944). See also *Chiara Estate,* 467 Pa. 586, 593–94, 359 A.2d 756, 760–61 (1976). The Superior Court has succinctly stated the principle: "The niceties of procedure and pleading make fine intelligence games for lawyers but should never be used to deny ultimate justice. This is the reason

460

for our modern approach to rules of civil procedure." *Godina v. Oswald,* 206 Pa.Super. 51, 55, 211 A.2d 91, 93 (1965).

*Griffin v. Tedesco,* 336 Pa.Super. 586, 593, 486 A.2d 419, 423 (1984), quoting *Pomerantz v. Goldstein,* 479 Pa. 175, 178, 387 A.2d 1280 (1978). Given the absence of prejudice and surprise to appellants, we find that the trial court properly granted appellees' motions for summary judgment notwithstanding appellees' failure to argue the release as an affirmative defense in amended pleadings.

Appellants' second argument is that the trial court should not have granted summary judgment based on the release because appellant who signed the release did not understand that the release included medical malpractice claims against the appellees. Although appellant claims that she did not intend to release appellees when she signed the release, the effect of a release is determined by the ordinary meaning of its language. *Estate of Bodnar,* 472 Pa. 383, 386, 372 A.2d 746, 748 (1977). This court interpreted a similar release to the present one in *Hasselrode v. Gnagey,* 404 Pa. 549, 172 A.2d 764 (1960). This court held that the release, extending to "any and all persons," was intended to release an individual not named in the release and who paid no consideration for the release. *Id.* 172 A.2d at 765. Further, a misjudgment by the signor of the release as to the precise nature and extent of injury will not permit recission of a release agreement when the release contains broad language as in the instant case. *Leyda v. Norelli,* 387 Pa.Super. 411, 413, 564 A.2d 244, 245 (1989), appeal denied 525 Pa. 627, 578 A.2d 414 (1990).

In the present case, the appellants signed an agreement that released *all* persons, firms or corporations charged or chargeable with responsibility or liability with respect to Johnson's accidental fall. According to the plain language of the release, appellees were released from liability although they were not specifically named in the release. *Hasselrode, supra.*

When our supreme court was faced with the interpretation of a similar release in *Buttermore v. Aliquippa Hospital,* 522 Pa. 325, 561 A.2d 733 (1989), the court ruled that absent a showing of fraud or mutual mistake, the release by its terms discharged all claims and parties pertaining to the accident. Our supreme court stated the following in support of its ruling:

If such a release can be nullified or circumvented, then every written release and every written contract or agreement of any kind no matter how clear and pertinent and all-inclusive, can be set aside whenever one of the parties has a change of mind or whenever there subsequently occurs a change of circumstances which were unforeseen, or there were after-discovered injuries, or the magnitude of a releasor's injuries were unexpectedly increased, or plaintiff made an inadequate settlement. It would make a mockery of the English language and of the law to permit this release to be circumvented or held to be nugatory.

*Id.* 561 A.2d at 735, quoting *Emery v. Mackiewicz,* 429 Pa. 322, 240 A.2d 68 (1968).

A panel of this court was presented with a similar set of facts in *Smith v. Thomas Jefferson University Hospital,* 424 Pa.Super. 41, 621 A.2d 1030 (1993). In that case, plaintiff's decedent was involved in an automobile accident with another automobile operated by William J. Barben, Jr. Following the accident, decedent received medical treatment at defendant-hospital. Plaintiff subsequently executed a general release in favor of Mr. Barben that was substantially similar to the release in the present case. Plaintiff then filed a medical malpractice action against the hospital and doctors that treated decedent after his accident. This court addressed the question of whether the trial court erred in granting defendants' motion for judgment on the pleadings based upon the release executed by plaintiff. In its decision, this court rejected plaintiff's argument that plaintiff did not intend to release the hospital and doctors when she signed the release. Specifically, this court held the following:

Mutual mistake will afford a basis for reforming a contract. *Gocek v. Gocek,* 417 Pa.Super. 406, 612 A.2d 1004 (1992). Mutual mistake exists, however, only where "both parties to a contract [are] mistaken as to existing facts at the time of execution." *Loyal Christian Ben. Ass'n v. Bender,* 342 Pa.Super. 614, 618, 493 A.2d 760, 762 (1985); Restatement (Second) Contracts, Section 152 (1981). Moreover, to obtain reformation of a contract because of mutual mistake, the moving party is required to show the existence of the mutual mistake by evidence that is clear, precise and convincing. *Bugen v. New York Life Insurance Co.,* 408 Pa. 472, 475, 184 A.2d 499, 500 (1962).

In the instant case, [plaintiff] has failed to evince a mistake on the part of Barben the other party to the release. [Plaintiff] merely asserts that she never intended to release parties other than Barben and his insurance carrier. It is clear from [plaintiff's] assertions that the only mistake which was made regarding the formation of the contract-release between appellant and Barben was her own. *See, e.g., Leyda v. Norelli,* 387 Pa.Super. 411, 413, 564 A.2d 244, 245 (1989) ("[U]nderestimating damages or making a settlement before damages are accurately ascertained is not considered a mutual mistake of fact.")

A similar release was also at issue in *Dublin by Dublin v. Shuster,* 410 Pa.Super. 1, 598 A.2d 1296 (1991). *Dublin* involved a child who was struck by an automobile. The child's parents executed a general release against the driver of the automobile. This court held in *Dublin,* that the release barred the parents' and child's medical malpractice suit against the doctors and the hospital that treated the injuries the child sustained in the accident. The trial court had denied the doctors' and hospital's motion for summary judgment. In reversing the trial court's holding, this court ruled that general releases are applicable to all tortfeasors regardless of the fact that they are not specifically included in the release. *Id.* 598 A.2d at 1298.

Here, since the release agreement discharged appellees' liability to appellants, we find that summary judgment was appropriately granted by the trial court.

Appellants' final contention is that because only one of the co-administratrices of Johnson's estate executed the release, the estate is not bound to the release agreement. One administratrix signed the release while the other signed as a witness to the signature. We find appellants' argument to be meritless.

In support of their argument, appellants cite *Buttermore, supra.* In *Buttermore,* our supreme court held that parties may not bargain away the rights of another, not a party to the agreement. Appellants claim that since appellant Terri Hyden signed the release agreement as a witness and not as a party to the agreement, she has a right to bring the medical malpractice action against appellees. Appellants reliance on *Buttermore* is inappropriate because Terri Hyden is not asserting independently a right to sue appellees for her injuries. Rather, appellants filed the present suit in their capacities as co-administratrices of Johnson's estate.

This court has stated that co-executors and co-administrators are regarded as one person, and each possesses full power and control over the personal estate of a decedent. *Selig v. Selig,* 217 Pa.Super. 7, 10, 268 A.2d 215, 218 (1970). The authority of each co-executor or co-administrator is joint and several, and one has the power to bind the estate to an agreement. *Id.*

Presently, appellant Gail Holmes signed the release in her capacity as co-administratrix of Johnson's estate. Therefore, despite the fact that only one of the co-administratices signed the release, the estate was bound to the terms of the release agreement. *Id.* We, therefore, affirm the trial court's order granting appellees' motion for summary judgment.

Order affirmed.

BROSKY, J., files a concurring opinion.

BROSKY, J., concurring.

I reluctantly concur in the result of the majority's opinion. I feel constrained to concur in light of various decisions which appear to control the present controversy. However, I cannot agree with the reasoning set forth in those decisions.

In the present case appellants are the administrators of their father's estate. Their father died several days after sustaining head injuries in an accidental fall at the home of some friends. Acting as administrators of their father's estate, appellants signed a "release" of liability form ostensibly releasing the homeowners from any additional liability and settling the claim of the estate against them. The consideration paid was a sum of ten thousand dollars, a modest sum in today's times. The consideration was that modest because it was apparently understood by appellants to be the limits of the homeowners' property insurance. Be that as it may, appellants did not believe the sole cause of their father's death was the injuries sustained in the fall. Appellants believed that their father's death was more proximately caused by negligent treatment received after he sustained the injuries subject to the settlement. In other words, they believed that, although injured in the fall, the decedent never should have died from those injuries. Consequently, they filed suit against the hospital and doctors in question only to find that their signing of the release with the homeowners has worked to prevent recovery from these parties as well. This is true despite the fact that the various appellees were not parties to the release and paid no consideration to appellants for the release from liability.

The supposed goal of judicial interpretation of a contract is to effectuate the intent of the parties, if not the actual shared intent of both parties—should there, indeed, be one—then at least the intent fairly and reasonably implicated by the terms of the agreement and the surrounding circumstances. A sort of intent imputed to the parties and regarded as their actual intent. Ideally then, with respect to the release in question, it should not release third parties to it unless that was the *actual* contemplated intent of the parties who signed the release.

Yet, the premise that the parties actually intended that result is mostly preposterous. I doubt that anyone truly believes that appellants knowingly intended to release their claims against the doctors and hospital by virtue of executing the release with the homeowners and the receipt of ten thousand dollars. Those parties represented the "deep pockets" of the case. Moreover, the parties, at that time, were negotiating only with the homeowners. There was no discussion with the hospital and doctors regarding potential medical malpractice liability. More likely, in settling with the homeowners, appellants were attempting to get the "small case" out of the way before proceeding to the "big case."

That the homeowners intended to benefit unnamed potential defendants by executing the release is only slightly more plausible. There seems to be little reason that a homeowner would care or even think about the potential liability of another party when defending against a lawsuit or claim for damages. More likely, an average person in the position of the homeowners here would be greatly concerned about the ramifications of the proceedings against them and give no thought at all to other potential defendants. Thus, to suggest that the homeowners, in settling, intended by the execution of the release to also confer that benefit upon unnamed parties is somewhat dubious. The homeowner really has nothing to gain from such an intention or action and it is not something which would naturally come within his or her contemplation.[1] Thus,

1. Perhaps the only individual or entity which has intended the result our courts are imposing in these situations is the insurer. The insurer may have this intention to protect itself from paying out more money should one or more of the third parties spared liability as a result of the signing of the release happen to be one insured by itself. Should this occur, the payment of $10,000 on behalf of the homeowners might spare the insurer liability in the millions of dollars when a doctor or hospital it has insured escapes liability as a result of the signing of the release. Even if this possibility is remote, it figures that if all, or most, insurance companies draft their releases in similarly broad fashion the industry as a whole will certainly be spared a significant amount of money as a result of potential "deep pocket" defendants being saved from liability when unsuspecting claimants or litigants execute releases like the one found here to settle seemingly unrelated claims. The more insurers who use such releases the more likely that all will benefit in

in situations like the present one, it can be fairly assumed that it is not the actual intent of both parties that unnamed and unrelated parties be "released" from liability by virtue of execution of the release. Nevertheless, this is exactly what the prior decisions of our courts have dictated.

In *Buttermore v. Aliquippa Hospital,* 522 Pa. 325, 561 A.2d 733 (1989), under a similar factual pattern, our Supreme Court found that the release, by its own wording, released all parties from liability. They commented:

> If such a release can be nullified or circumvented, then every written release and every written contract or agreement of any kind no matter how clear and pertinent and all-inclusive, can be set aside whenever one of the parties has a change of mind or whenever there subsequently occurs a change of circumstances which were unforeseen.... It would make a mockery of the English language and of the law to permit this release to be circumvented or held to be nugatory.

I do not dispute the validity of this commentary as to the parties to the release agreement. Should appellants have a change of heart and attempt to extract more money from the homeowners, I would agree that their execution of the release would prevent those efforts. I would support this position even if the appellants argued that they did not understand the implications of the release or had made a mistake in executing it. To do otherwise is to make the agreement impotent and illusory. However, I do not believe that the commentary is particularly persuasive as to its application to strangers to the release. Appellants here are not suggesting that the release can be negated as to the homeowners who signed it, appellants' only argument is that the release should not work to bestow a benefit to third parties who did not contribute to the consideration, who did not bargain for a release of liability and

the long run. Consequently, it is not difficult to imagine the insurer possessing this intent.

However, when representing an insured in a liability context, the insurer is not truly a party in interest, the insured is. Consequently, the insurer's intent in drafting the release so broadly is not pertinent to interpreting the document as between the parties who signed it.

who did not sign the document. As to such parties the release acts as a windfall benefit under circumstances that clearly penalize the releasor.

If it is clear that one did not intend to release other potential defendants when signing a release, as I believe is the case here, then giving the release that effect is at best punishing the releasor for his or her naivete, and at worst, when only the releasee intended such a result, allowing a near fraud to be perpetrated upon the releasor. If neither party intended such a result then arguably there is a "mutual mistake" at work and that interpretation should not follow at all. However, regardless of the scenario, it is very unlikely that that result was truly bargained for. Consequently, it begs the question: why are we so willing to allow a stranger to enforce an agreement to which he is not a party, has paid no consideration for and did not participate in the negotiation of? From a policy standpoint there seems little reason to allow this result other than to elevate form, the verbose and overbroad wording of boilerplate release forms, over substance, the actual intent of the parties in question.

Aside from the above commentary, the standing and position of the third party to assert the release must be questioned. When one asserts a release under circumstances like the present he is essentially asserting a third party benefit. He is not a party to the contract, nor is he in privity to a party. Consequently, he is attempting to be a third party beneficiary under the contract. Yet when the caselaw regarding third party beneficiaries is reviewed you find that these contracts are rather restrictively enforced.

Recently, in *Scarpitti v. Weborg*, 530 Pa. 366, 609 A.2d 147 (1992), our Supreme Court recited the qualifications for being recognized as a third party beneficiary. They stated that one becomes a third party beneficiary:

only where both parties to the contract express an intention to benefit the third party in the contract itself, ... *unless,* the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of

the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Id.,* 609 A.2d at 150–151. (emphasis in original) Under the above criteria it is difficult to understand why a stranger to the contract is allowed to enforce it against the releasor. It is difficult to conclude that the release agreement expresses an intent to benefit a third party unless one determines that in including the language "and any other person, firm or corporation charged or chargeable with responsibility or liability," the parties expressly intended to benefit an unknown and indefinite class of persons. More likely, this language is typical overbroad legal phrasing intended to encompass the parties and all their privies. However, even if it were the intention of the parties to release everyone in the world who might also be liable to the releasor, it is questionable that such a broadly defined class of persons or entities would qualify for third party status.

The second prong of the analysis fails also. Recognizing a third party's right cannot be said to be necessary to effectuate the intent of the parties. The clear and primary intent in signing the release agreement is to settle the dispute finally as between the parties signing the agreement. If the agreement works to offer the same immunity from a lawsuit to an unknown third party, as the court held below, then this would seem to be at best an ancillary or incidental intent of the parties, it is clearly not the primary intent of the parties. Consequently, I believe that a third party's right to claim third party beneficiary status under the release is suspect. If a third party does not gain benefit of the release as a third party beneficiary, then the only other theory that comes to mind that might allow the third party to rely upon the release is estoppel. However, this also appears dubious.

"A cause of action under detrimental reliance or promissory estoppel arises when a party relies to his detriment on the intentional or negligent representations of another party, so that in order to prevent the relying party from being harmed, the inducing party is estopped from showing that the facts are

not as the relying party understood them to be." *Rinehimer v. Luzerne County Community College*, 372 Pa.Super. 480, 539 A.2d 1298, 1306 (1988). It is straining the above definition, in my opinion, to assert that in settling with the homeowners, appellants have made a promise to appellees. Secondly, I see no reliance to appellees' detriment. To the contrary, appellees were in a position of having to defend themselves in a lawsuit of potentially large proportions until such time as they discovered the execution of the release in question. These are not circumstances that invite the application of promissory estoppel.

If the above two theories do not allow a third party to assert a release as a defense, then the propriety of allowing that assertion at all is suspect. Especially when it is considered that the parties probably did not have an explicit intent to release such third parties, and it is clearly inequitable to allow the third party to assert it. Consequently, I believe that the policy behind allowing a stranger to a release to assert it as a defense in a context such as the present one should be reexamined by our Supreme Court and overruled.